UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMILY LITTLER, et al.,

           Plaintiffs,

    v.

BAY AREA RAPID TRANSIT DISTRICT (BART), et al.,

           Defendants.

Case No.  14-cv-05072-DMR

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 42

      Plaintiffs Emily Littler and Peter Cid filed a civil rights action under 42 U.S.C. § 1983 and state law claiming that they suffered constitutional violations committed by Bay Area Rapid Transit District ("BART"), a municipal corporation, and BART Police Officers Sergeant Keith Justice, Sergeant Myron Lee, and Officer Sean Roan (collectively, the "Defendant Officers") in connection with Plaintiffs' October 2013 arrests.  Defendants now move for summary judgment. [Docket No 42.]  The court held a hearing on March 31, 2016.  For the following reasons, Defendants' motion is granted in part and denied in part.

I.      **BACKGROUND**

      **A.  Factual Background**

      The facts recounted in this section are undisputed, unless otherwise noted.

      On the evening of October 11, 2013, Sergeant Justice, Sergeant Lee, and Officer Roan traveled to the 16th Street BART station in San Francisco in response to a report of a battery on a BART employee involving two suspects, a male and a female.  Upon his arrival, Justice spoke with BART employees Duane Bullard and Sidra Johnson about the alleged battery.  Roan Dep. 28. Justice's discussion with Bullard and Johnson was captured on video by Justice's body camera. Downs Decl., Feb. 18, 2016, Ex. D (Justice Mobile Video Recorder ("MVR").  Bullard and Johnson informed Justice that "a gentleman and his girlfriend" got off a train and were being loud

1    and belligerent.  According to Johnson, the two were yelling about the BART employees' salaries,

2    and then the man threw a pizza box at her.  The two individuals then walked away, "screaming

3    and yelling," and the man went upstairs and exited the station.  He then returned to the station, still

4    yelling, and had an altercation with Bullard.  Justice MVR 0:32-1:20.  Bullard informed Justice

5    that the man swung at Bullard and knocked Bullard's hat off of his head.  In response, Bullard hit

6    the man and told him to stay away because he was "spitting in [Bullard's] face" while he was

7    talking to him.  Johnson told Justice, "he needs to be arrested."  Justice confirmed that Bullard was

8    uninjured and did not require medical attention.  Justice told Bullard and Johnson that he was

9    going to get a few more BART officers and "do an ID process."  *Id*. at 1:20-2:00.  He then walked

10   to where Roan and Lee were standing with Cid and Littler.

11         Meanwhile, in another location within the BART station, Lee and Roan relieved the two

12   San Francisco Police Department ("SFPD") officers who had been standing with Littler and Cid.

13   According to Roan, the SFPD officers had separated Cid and Littler "and basically detained them

14   inside [the BART] station, in the free area."  Roan Dep. 28.  Neither was handcuffed.  *Id*. at 29.

15   Lee testified that he believed that Cid and Littler were involved with the reported battery, and that

16   the BART officers needed to investigate each individual's role in the alleged battery.  Lee Dep.

17   15-16, 22.  Lee approached Cid, and Roan went to Littler.  Roan Dep. 29.

18         Lee's body camera recorded his conversation with Cid.  Downs Decl., Ex. E (Lee MVR).

19   In response to Lee's questioning, Cid described his altercation with Bullard.  Cid told Lee that he

20   and Littler were exiting the station and "somebody touched [Littler]."  Lee MVR 0:46-0:49.  Cid

21   stated that he became "apprehensive."  He then stated, "I pulled [Bullard's] hat off, I'm not going

22   to lie, I pulled his beanie off, and then all of a sudden he punched me in the chin."  Lee MVR

23   0:51-1:29; *see also* Cid Dep. 19 (admitting that he physically touched Bullard's hat while it was

24   on his head).  He also told Lee, "I am ready for any kind of issues, that's why I stayed here," and

25   stated that he was ready to press charges against Bullard.  Lee MVR 1:29-2:09.

26         Roan spoke with Littler in a location several feet away from Lee and Cid.  Roan described

27   Littler as "very excited."  He testified that he started to ask her what had happened and she was

28   "yelling about being touched on a train," and was jumping from subject to subject.  Roan Dep. 30.

United States District Court
Northern District of California

2

Littler admitted that she had been drinking alcohol.  *Id*.  At some time during Roan's questioning of Littler, Justice arrived at their location.  On Justice's body camera recording, Littler can be heard saying "I want to go home, I want to go home," to which Roan responded, "at this point you're being detained." Justice MVR 4:01-07.  Justice, who had walked over to Roan, gestured toward Littler and then Cid, and told Roan, "she's involved, he is, it looks like 243.3."[1]  Justice MVR 4:39-44.  Littler moved closer to Justice and Roan while they were talking, and Roan asked her, "Can you stand over there?"  In response, Littler cried "what do you want me for?  What do you want me for?" and Justice answered, "because you're part of the whole issue here."  Justice MVR 4:44-4:50.  Littler continued to express her desire to go home, to which Roan responded, "that's not going to happen at this point," and told her that they were "trying to get this sorted out so we can get everybody where they need to go."  *Id*. at 4:50-4:57.

Justice gestured in Bullard and Johnson's direction and told Roan, "so, basically, both of those [people] want to press charges against this guy here," referring to Cid.  He described Littler and Cid as "pretty well intoxicated," and told Roan that they had been complaining about BART and one of them had thrown a pizza box at Johnson.  Justice informed Roan that he was not sure whether Cid or Littler had thrown the box, but that Cid had "[taken] a swipe" at Bullard, who was not injured but had had his hat knocked off his head.  Justice reported that Bullard and Cid had then "mixed it up a little bit."  Justice directed Roan to get statements from Bullard and Johnson and one other possible witness, and stated that Bullard and Johnson "want to definitely put [Cid] under citizen's arrest."  Justice also directed Roan to "find out how much involvement [Littler] had other than being just with [Cid]."  Justice MVR 4:59-6:30; Roan Dep. 36-37; Justice Dep. 45-46.

After Roan walked away, Justice asked Littler how much she had had to drink.  Littler told him she had consumed four beers.  Justice asked if she was taking any medication.  Littler denied taking any medication and repeated that she just wanted to go home.  Justice responded, "you

---

[1] It appears that Justice was referring to California Penal Code section 243.3, which specifies the punishments for battery against transportation personnel.  Justice's report of the incident listed California Penal Code section 243.35(a), which addresses the punishment for battery while on a public transportation provider.  Pointer Decl., March 3, 2016, Ex. 6; *see also* Justice Dep. 78.

United States District Court
Northern District of California

1   seem pretty inebriated for four beers."  Littler, who was visibly agitated, explained that she was

2   upset because someone "tried to touch [her] on the BART system," and asked why Justice wasn't

3   trying to find that person.  At some point, Justice informed Littler that he was recording their

4   interaction.  Justice MVR 6:31-7:11.  Littler repeated, "I just want to go home," and tried to take a

5   few steps past Justice, walking toward the nearby escalator.  The video appears to show Justice

6   grabbing Littler's arm while saying, "you need to stop," to which Littler responded, yelling, "Oh

7   my god, you're touching me, oh my god."  The video does not clearly show Littler's movements

8   or Justice's immediate physical reaction.  It does show Justice taking Littler down to the ground,

9   face down, saying "put your hands behind your back," while Littler screamed.  Justice MVR 7:12-

10   7:19.

11          Describing her physical interaction with Justice, Littler testified that she was "physically

12   grabbed" by Justice before he took her to the ground.  Littler Dep. 81.  She described her actions

13   as follows:

14          He didn't say, "hey, you're not allowed to leave, you can't go."
       They just – as far as I remember, they just grabbed my arm and I
15          asked, "Don't touch me.  Please don't touch me."  And they grabbed
       me when I tried to shake.  That's what I mean by get away, not like
16          run further.  I tried to shake their arm off of me.

17   Littler Dep. 82.

18          Justice testified that he "had to grab her to keep her from walking away while she was

19   being detained, and she resisted that detention until I finally had to take her down to the ground to

20   keep her from leaving."  Justice Dep. 51.  According to Justice, he "was just trying to control one

21   of [Littler's] arms, but her behavior was so wild, [he] felt for his own safety and for hers, [he]

22   needed to take her to the ground," so he combined an arm bar "with a takedown."  Justice Dep. 56-

23   57.  Justice also testified that Littler was "obviously intoxicated," and that her "over-the-top

24   behavior" in attempting to flee "led [him] to believe that her behavior was either a danger to

25   herself and/or others."  Justice Dep. 78-79, *see also* 85 (Justice: "Was she intoxicated in public?

26   Absolutely.  To the point where she's a danger to herself or others?  That became when she fled

27   the interview.").

28          Lee had been standing with Cid.  Lee moved to assist Justice as he was taking Littler to the

United States District Court
Northern District of California

4

1    ground.  Lee's body camera recording shows Justice and Littler on the ground, with Justice's hand

2    on Littler's back.  Lee MVR 4:47-4:55; Lee Dep. 34, 38.  Justice's video shows Cid approaching

3    Littler on the ground, and Justice and Lee repeatedly yelling at Cid to "get away" and "back up."

4    Justice MVR 7:20-7:31; Lee MVR 4:54-5:05.  Justice's video appears to show a knee, possibly

5    Lee's, on Littler's back, and Justice saying "I got her."  The officer who appears to be Lee then

6    stood up and walked toward Cid.  Justice MVR 7:31-7:48.

7         A few seconds later, the video shows Littler trying to flip over while lying on the ground.

8    The officers are heard telling Littler to stop and to "relax," with one officer saying "stop resisting"

9    while she screams expletives.  The video also shows Roan assisting Justice and Lee with

10   handcuffing Littler.  Justice MVR 7:49-8:39; Lee MVR 5:40.  Littler testified that she did not

11   remember trying to get up off the ground, but that she was "in a lot of pain all over," and that she

12   "wanted them to stop hurting [her]."  Littler Dep. 82.

13        The officers described Littler's actions on the ground as follows.  According to Justice,

14   after he had taken Littler to the ground, she "bust[ed] lo[o]se after awhile," and did a "180 flip,"

15   after which he handcuffed her.  Justice Dep. 58.  Lee recalled that Littler was "on her back and

16   with—with a lack of a better term, she was trying to buck off Sergeant Justice, who was straddling

17   her."  Lee Dep. 43.  According to Roan, Littler was on her side and it looked like she was

18   "flipping over trying to get on her back or in a standing position."  Roan Dep. 43-44.  With respect

19   to handcuffing, Lee wrote in his report that he "grabbed [Littler's] arm and placed her in a control

20   hold for handcuffing," but he does not remember the exact control hold he used.  Lee Dep. 42-43.

21   Roan stated that by the time he reached Justice and Littler, the officers were either already

22   handcuffing her or trying to get her under control, so he "took a control hold, which was a rear

23   wrist lock and kneeled down beside her . . . and held her there so that Sergeant Justice could place

24   her in handcuffs."  Roan Dep. 44.

25        Cid also took video which recorded Littler's actions while on the ground.  Downs Decl.

26   Ex. I (Cid Video).  Cid's video shows Littler on her back, repeatedly lifting her hips while an

27   officer is sitting on her, and then kicking her legs.  Cid Video 0:07-:17.  After she stops moving,

28   the video shows Justice straddling her over her waist area, Roan kneeling on the floor near her

United States District Court
Northern District of California

5

1    head, and Lee kneeling near her feet while Littler is being placed in handcuffs. Cid Video 0:40.

2          While Littler was being handcuffed on the ground, Cid approached the officers and Littler

3    and Roan instructed him to back up at least five times. Justice MVR 8:22-8:55. Cid repeatedly

4    told the officers to get off of Littler, that their actions were unnecessary, and that he was recording

5    them. Justice then stated, "I got her," and directed Roan to "take care of [Cid]." Roan got up and

6    walked over to Cid. Justice MVR 8:55. On Justice's video, Cid can be heard saying, "you're

7    going to restrain me? You're going to restrain me?" while Littler cries. Justice MVR 8:58-9:20.

8    Roan informed Cid that he was being arrested and placed Cid in handcuffs. Cid Video 1:08-1:12.

9          Littler stood up a few minutes after being handcuffed. Pointer Decl. Ex. 10 (Justice MVR

10   2) 3:10-3:16. She remembers feeling a sharp pain in her left wrist while she was on her stomach

11   on the ground. She alleges that she suffered a fractured wrist as a result of the incident. Littler

12   Dep. 32, 79-80. Littler was subsequently transported to jail and booked for violating California

13   Penal Code section 243(b), battery on a peace officer; section 148(a), resisting a peace officer; and

14   section 647(f), public intoxication. Pointer Decl. Ex. 12 (Roan Report).

15         After handcuffing Cid, Roan brought him to a holding area where Cid provided a voluntary

16   statement in which he admitted that he "removed [Bullard's] beanie cap off of Mr. Bullard's

17   head." Roan Decl., Feb. 18, 2016, ¶ 6. Roan then interviewed Bullard. During the interview,

18   which was recorded by Roan's body camera, Bullard stated that Cid and Littler were walking

19   toward the exit and when they passed him. Bullard had a mop in his hand. Cid yelled at Bullard

20   to clean up pizza that was on the ground, and commented on Bullard's salary. Cid walked upstairs

21   out of the station, then returned. Bullard told Roan that Cid got three to four inches from

22   Bullard's face, and then "swung . . . and knocked my hat off my head." Downs Decl. Ex. H (Roan

23   MVR) 1:49-4:06. Bullard stated he "defended himself" and tried to keep Cid away from him

24   because Cid "kept coming after [him.]" Roan MVR at 4:46-5:03. Roan asked Bullard if he

25   wished to press charges against Cid for the battery, to which Bullard responded, "yes." Roan

26   MVR at 5:30-5:52. Roan later transported Cid to San Francisco County Jail to be booked on

27   suspicion of committing a battery in violation of California Penal Code section 243.35. Roan

28   Decl. ¶ 6.

### B.  Procedural History

Plaintiffs filed their complaint on November 17, 2014 against BART and Does 1-50. [Docket No. 1.]  They filed an amended complaint on June 4, 2015, naming the individual Defendant Officers, as well as BART employees Johnson and Bullard.  [Docket No. 19.]  In their amended complaint, Plaintiffs alleged the following causes of action: 1) 42 U.S.C. § 1983 ("section 1983") claim for violation of the Fourth and Fourteenth Amendments against Justice, Lee, and Roan; 2) section 1983 claim for municipal liability against BART; 3) violation of California's Bane Act, California Civil Code section 52.1 against Justice, Lee, and Roan; 4) negligence against Justice, Lee, Roan, Johnson, and Bullard; 5) battery against Justice, Lee, Roan, Johnson, and Bullard; and 6) false arrest/false imprisonment against Justice, Lee, and Roan.  On January 6, 2016, Plaintiffs voluntarily dismissed with prejudice all claims against Johnson and Bullard.  [Docket No. 38.]

## II.     LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor.  *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a

1    scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252;

2    conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738

3    (9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is

4    blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

5    adopt that version of the facts" when ruling on the motion.  *Scott*, 550 U.S. at 380.

6    **III.   CLAIMS NO LONGER AT ISSUE**

7          In their opposition, Plaintiffs did not address and/or conceded their claims for municipal

8    liability against BART, claims under the Fourteenth Amendment, state law false arrest/false

9    imprisonment claims, and request for punitive damages.  Cid also conceded his claims against

10   Defendant Lee.  Accordingly, those claims are dismissed with prejudice.

11         Littler's remaining claims are against Defendants Justice, Roan, and Lee.  Cid's remaining

12   claims are against Defendants Justice and Roan.

13   **IV.   LITTLER'S CLAIMS**

14         **A.  Fourth Amendment Unlawful Seizure Claims**

15              **1.   Legal Framework**

16         "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

17   Government."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S.

18   1, 9 (1968)).  In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment

19   jurisprudence.  *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing

20   *Terry*).  "The first tier consists of those law enforcement activities, such as police questioning

21   conducted pursuant to valid consent, that do not constitute searches or seizures governed by the

22   Fourth Amendment."  *Erwin*, 803 F.2d at 1508.

23         "The second tier consists of limited intrusions such as pat-downs of the outer clothing (or

24   'frisks') and brief investigative detentions.  To justify these 'limited' searches and seizures, law

25   enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently

26   committed a crime or is about to commit one."  *Id.*  During a so-called *Terry* stop, police officers

27   are entitled to employ reasonable measures to protect themselves and others in potentially

28   dangerous situations.  *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995).

United States District Court
Northern District of California

8

1    However, "[i]nvestigative stops based upon suspicion short of probable cause are . . .

2    constitutionally permissible only where the means utilized are the least intrusive reasonably

3    available." *Kraus v. Pierce Cty.*, 793 F.2d 1105, 1108 (9th Cir. 1986). "[A]n investigative

4    detention must be temporary and last no longer than is necessary to effectuate the purpose of the

5    stop. Similarly, the investigative methods employed should be the least intrusive means

6    reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida*

7    *v. Royer*, 460 U.S. 491, 500 (1983).

8        "The third tier comprises 'full scale' searches or arrests requiring probable cause." *Erwin*,

9    803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest

10   occurs and probable cause is required."). To determine whether a seizure has ripened into a full-

11   scale arrest, the court must consider the "totality of the circumstances." *United States v. Del Vizo*,

12   918 F.2d 821, 824 (9th Cir. 1990) (quoting *United States v. Baron*, 860 F.2d 911, 914 (9th Cir.

13   1988), *cert. denied*, 490 U.S. 1040 (1989)). No one factor is dispositive when evaluating the

14   totality of the circumstances, which includes "the extent that freedom of movement is curtailed

15   and the degree and type of force or authority used to effectuate the stop." *Kraus*, 793 F.2d at 1109

16   (citation omitted); *see also Del Vizo*, 918 F.2d at 824. "This is a highly fact-specific inquiry that

17   considers the intrusiveness of the methods used in light of whether these methods were

18   'reasonable *given the specific circumstances*.'" *Green v. City & Cty. of San Francisco*, 751 F.3d

19   1039, 1047 (9th Cir. 2014) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996))

20   (noting that "because this inquiry is fact specific, it is often left to the determination of a jury").

21   The proper focus in determining whether the coerciveness or restraint used in a stop is sufficient to

22   constitute an arrest is viewed from the perspective of the person seized, not from the perspective

23   of the officers. *City of Portland*, 73 F.3d at 235 (citation omitted). The test is whether "a

24   reasonable innocent person in these circumstances would not have felt free to leave after brief

25   questioning," *id*., "i.e., that indefinite custodial detention is inevitable." *United States v. Guzman-*

26   *Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (citing *Kraus*, 793 F.2d at 1109 ("where force is used

27   such that the innocent person could reasonably have believed he was not free to go and that he was

28   being taken into custody indefinitely, an arrest has occurred." (citation omitted))).

United States District Court
Northern District of California

9

2.      **Analysis**

a.      **Littler's Detention**

The Defendant Officers argue that Roan and Lee's detention of Littler was a continuation of the SFPD officers' detention, and that it was reasonable to continue to detain her so that they could investigate her involvement in the altercation between Cid and Bullard. They concede that Littler's detention ripened into an arrest when Justice took Littler to the ground to handcuff her.

Although Littler does not challenge the lawfulness of the early portion of the detention, she argues that she should have been released more quickly. She claims that after Justice learned from Johnson and Bullard that Cid was the suspect who had knocked Bullard's hat off of his head and thrown the pizza box at Johnson, Justice knew that Littler had not committed a crime. Therefore, according to Littler, the Defendant Officers lacked a reasonable suspicion to detain her for questioning during the short period of time that elapsed between Justice learning facts that exonerated Littler, and Justice taking Littler to the ground. The court therefore will examine the lawfulness of Littler's detention during the period following Justice's interview of Johnson and Bullard, up until the moment that Justice took her to the ground. Based on Justice's video, the total time that elapsed between Justice concluding his interview of Johnson and Bullard and his takedown of Littler was approximately five minutes. Justice MVR 7:12-7:19.

An investigatory or *Terry* stop is reasonable under the Fourth Amendment if "the officer's action was justified at its inception," and the investigation "was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 392 U.S. at 20); *see also Royer*, 460 U.S. at 498 ("*Terry* created a limited exception to th[e] general rule" that police detentions require probable cause, wherein "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.").

When detaining a person under *Terry*, a police officer is entitled to conduct a limited investigation to determine if the person was involved in criminal activity. *See United States v. Hensley*, 469 U.S. 221, 229 (1985); *Royer*, 460 U.S. at 498; *Terry*, 392 U.S. at 30. The Ninth Circuit has held that the "detention of witnesses for investigative purposes can be reasonable in

10

1    certain circumstances." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013).

2    To determine the reasonableness of a witness's detention, courts examine "the gravity of the

3    public concerns served by the seizure, the degree to which the seizure advances the public interest,

4    and the severity of the interference with individual liberty." *Id.* (citing *Brown v. Texas*, 443 U.S.

5    47, 51 (1979)). "[I]n the hierarchy of state interests justifying detention, the interest in detaining

6    witnesses for information is of relatively low value." *Maxwell*, 708 F.3d at 1084 (citing *United

7    States v. Ward*, 488 F.2d 162, 169 (9th Cir. 1973) (en banc)).

8         The material facts of Littler's detention are undisputed. Roan and Lee arrived at the 16th

9    Street Station in response to a report about two suspects, a male and a female, involved in a

10   possible battery. Roan Dep. 25-27. Roan and Lee relieved the SFPD officers who had originally

11   detained the two suspects. A few minutes later, when Littler stated that she wanted to go home,

12   Roan can be heard telling her, "at this point you're being detained." Justice MVR 4:01-4:07.

13        In response to Justice's investigation of the matter, Bullard and Johnson explained that

14   Littler and Cid had been yelling and were belligerent, and that Cid threw a pizza box at Johnson

15   and swung at Bullard. Justice then informed Roan that Littler "[was] involved" and that it looked

16   like Cid had committed a battery. Justice described his conversation with Bullard and Johnson,

17   telling Roan that he was not sure whether Cid or Littler had thrown the pizza box. He directed

18   Roan to "find out how much involvement [Littler] had other than being just with [Cid]."

19        The Defendant Officers contend that they responded to a dispatch reporting two suspects

20   involved in a battery. After initially interviewing Bullard and Johnson, Justice appropriately

21   continued Littler's detention so that Roan could determine the level of her involvement by getting

22   statements from the witnesses.

23        In response, Littler contends that Justice interviewed Bullard and Johnson, and learned that

24   it was Cid, not Littler, who had committed the battery on Bullard and thrown the pizza box at

25   Johnson. Therefore, Littler argues that after that interview, Justice did not have a reasonable

26   suspicion that she had committed any crime, and that she was merely a witness.

27        Applying the *Maxwell* factors, the relevant public concern underlying the detention was to

28   obtain information about an alleged battery on a BART employee. Littler's detention advanced

United States District Court
Northern District of California

1    this public concern because she was an apparent eyewitness to the battery.  Moreover, Littler's

2    detention was short, lasting only about five minutes.  During that time, Roan went to obtain

3    witness statements and Justice began to question her.  On these facts, the court concludes that the

4    detention "interfered only minimally with liberty of the sort the Fourth Amendment seeks to

5    protect," given the purpose and length of the detention.  *See Illinois v. Lidster*, 540 U.S. 419, 427-

6    28 (2004) (holding highway traffic stops set up to investigate hit and run incident were objectively

7    reasonable where the overall delay was "a very few minutes at most." ).  Accordingly, the court

8    finds that no reasonable jury could conclude that Littler's detention was unconstitutional.

9         The court next turns to the question of whether Littler's pre-takedown seizure ripened into

10    an arrest for which probable cause was required.  To determine whether Littler's seizure ripened

11    into a full-scale arrest, the court must consider the totality of the circumstances.  The Ninth Circuit

12    has described the test as whether the officers' intrusive measures "would cause a reasonable

13    person to feel that he or she will not be free to leave after brief questioning—i.e., that indefinite

14    custodial detention is inevitable." *Guzman-Padilla*, 573 F.3d at 884.  Ordinarily, whether an

15    encounter constitutes a detention or arrest is a mixed question of law and fact.  *See United States v.*

16    *Cormier*, 220 F.3d 1103, 1110 (9th Cir. 2000).

17         Here, as discussed above, the material facts of Littler's detention are undisputed.  Based on

18    these undisputed facts, the court concludes that no reasonable jury could conclude that Littler's

19    detention prior to the takedown rose to the level of an arrest.  The total duration of the Defendant

20    Officers' detention of Littler was fairly brief, around seven minutes.  There are no facts to indicate

21    that the Defendant Officers' investigation of the reported battery was not diligent.  Justice spoke

22    with Bullard and Johnson, and then tasked Roan with learning the extent of Littler's involvement

23    in the battery and obtaining statements from Bullard, Johnson, and another witness.  *See, e.g.,*

24    *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (holding that while the length

25    of a detention is relevant, "more important is that [the officers'] actions did 'not involve any delay

26    unnecessary to the[ir] legitimate investigation.'" (quoting *United States v. Sharpe*, 470 U.S. 675,

27    687 (1985)).  At no point prior to Justice's takedown of Littler was she handcuffed or otherwise

28    subjected to a display or use of force from the Defendant Officers.  *See, e.g., United States v.*

United States District Court
Northern District of California

12

1   *Bravo*, 295 F.3d 1002, 1010 (9th Cir. 2002) ("handcuffing is a substantial factor in determining

2   whether an individual has been arrested.").

3          Littler offers no other facts or argument to support her claim that her detention ripened into

4   an arrest.  The court concludes that Littler's detention did not exceed the bounds of a valid

5   investigatory stop and grants summary judgment on Littler's unlawful arrest claim based upon her

6   pre-takedown detention.

7                          **b.      Littler's Arrest**

8          As noted, the Defendant Officers concede that Littler was arrested at the moment that

9   Justice performed a takedown and then handcuffed her while she was on the ground.  They move

10  for summary judgment on Littler's wrongful arrest claim on the ground that the arrest was

11  supported by probable cause.

12         "Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United*

13  *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692,

14  700 (1981)).  Probable cause to arrest exists when officers have knowledge or reasonably

15  trustworthy information sufficient to lead a person of reasonable caution to believe that an offense

16  has been or is being committed by the person being arrested.  *Id.* (citing *Beck v. Ohio,* 379 U.S.

17  89, 91 (1964)).  "Alternatively, this court has defined probable cause as follows: when 'under the

18  totality of circumstances known to the arresting officers, a prudent person would have concluded

19  that there was a fair probability that [the defendant] had committed a crime.'"  *Id.* (citing *United*

20  *States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986).  While conclusive evidence of guilt is not

21  necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or

22  even strong reason to suspect are not enough."  *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.

23  1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)).  "Probable cause is lacking if the

24  circumstances relied on are susceptible to a variety of credible interpretations not necessarily

25  compatible with nefarious activities."  *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994)

26  (citations omitted).

27         Probable cause must be determined at the time the arrest is made.  Facts learned or

28  evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless

United States District Court
Northern District of California

13

they were known to the officer at the moment the arrest was made. *City of Portland*, 73 F.3d at 236 (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)). "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

The Defendant Officers contend that probable cause existed to arrest Plaintiff for violation of California Penal Code sections 647(f) and 148(a)(1). California Penal Code section 647(f) provides that a person who engages in the following conduct is "guilty of disorderly conduct, a misdemeanor":

> [w]ho is found in any public place under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, controlled substance, or toluene, in a condition that he or she is unable to exercise care for his or her own safety or the safety of others . . .

Cal. Pen. Code § 647(f). California Penal Code section 148 provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is guilty of a misdemeanor. Cal. Penal Code § 148(a)(1). While section 148(a)(1) is "often referred to as a statute prohibiting 'resisting arrest' . . . the statutory prohibition is much broader than merely resisting arrest." *Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir. 2011). The elements of the crime of violating section 148(a)(1) are: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Yount v. City of Sacramento*, 43 Cal. 4th 885, 894-95 (2008) (citation omitted).

The Defendant Officers argue that Littler demonstrated objective, well-recognized signs of intoxication. They argue that even after having been told several times that she was not yet free to depart, Littler attempted to flee, and that this attempt established probable cause that she was unable to care for her own safety. They also argue that Littler's flight from the officers constituted probable cause supporting her arrest for violating section 148(a)(1) because she delayed the officers' investigation into the reported battery by forcing Roan and Lee to assist Justice in

14

United States District Court
Northern District of California

1  restraining her.

2      In response, Littler argues that the Defendant Officers' argument is "disingenuous"

3  because they did not arrest her for disorderly conduct.  This is belied by Justice and Roan's

4  reports, which list section 647(f) as one of Littler's accused offenses.  Pointer Decl. Ex. 6 (Justice

5  Report); Ex. 12 (Roan Report); Justice Dep. 78-79.  Littler offers no response to the Defendant

6  Officers' argument that they had probable cause to arrest her for violating section 148(a)(1).

7      As to Littler's arrest for violating section 647(f), the court finds that a reasonable jury

8  could disagree with Justice's conclusion that her attempt to flee demonstrated her inability to care

9  for her own safety as a result of her intoxication.  However, the undisputed facts show that the

10 Defendant Officers had probable cause to arrest Littler for violating section 148(a)(1).  Roan told

11 Littler more than once that she was not free to leave, and informed her that the officers were

12 "trying to get this sorted out so we can get everybody where they need to go."  Despite these

13 statements, Justice's video shows that Littler attempted to leave the scene, resulting in Justice

14 grabbing her arm and restraining her on the ground.  Given these undisputed facts, the court finds

15 that probable cause existed to arrest Littler for violating section 148(a)(1), because her flight

16 delayed and obstructed the Defendant Officers' investigation of the reported battery on Bullard.

17 Accordingly, summary judgment is granted as to Littler's unlawful arrest claim.

18     **B.  Fourth Amendment Excessive Force Claim**

19     The Defendant Officers next move for summary judgment on Littler's excessive force

20 claim, arguing that they used reasonable force in effecting her arrest.  In the alternative, the

21 Defendant Officers argue that they are entitled to qualified immunity.

22     A claim of excessive force in the context of an arrest or investigatory stop implicates the

23 Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see*

24 *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a

25 particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the

26 nature and quality of the intrusion on the individual's Fourth Amendment interests against the

27 countervailing governmental interests at stake."  *Id.* at 396 (citations and internal quotation marks

28 omitted).  Because the reasonableness standard is not capable of precise definition or mechanical

application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted); *see also Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994) ("[w]hether the amount of force used was reasonable is usually a question of fact to be determined by the jury" (quoting *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir 1991)).

The Officer Defendants argue that Justice had probable cause to arrest Littler when she first attempted to flee the station during her detention, and that her active resistance necessitated force to overcome her resistance. Here, Justice's video shows Littler's attempt to walk past him, but does not depict the details of his physical contact with her. It appears that he grabbed her arm while telling her to stop, and indeed, he testified that he "had to grab her to keep her from walking away while she was being detained." Justice Dep. 51. Justice testified that Littler's behavior at that point was "wild" and caused him to fear for his safety, so he combined an arm bar with a

takedown.  Littler testified that she tried to "shake" Justice's arm off of her, but the video does not show the movement of her arms during their initial physical contact.  Once she was on the ground, Lee and Roan arrived to assist Justice.  Lee admitted that he grabbed Littler's arm and placed her in a control hold, and Roan testified that he put Littler in a rear wrist lock so that Justice could put her in handcuffs.  At some point, Littler can be seen on Cid's video repeatedly lifting her hips in what appears to be a motion to get Justice off her body and then kicking her legs.  Lee described Littler's movements as an attempt to "buck off" Justice, who was straddling her.  Littler does not dispute that once she was on the ground, she was actively resisting the officers' attempts to restrain her.

Turning to the *Graham* factors with respect to Justice's initial takedown of Littler, the court begins by noting that the Defendant Officers had responded to a dispatch about a battery on a BART employee, which is a violent crime.  Based on Justice's videotaped statements, he knew at the time he performed the takedown that Cid had allegedly committed the battery of Bullard, but he was unsure of Littler's involvement.  Justice had also formed an opinion that Littler was "pretty well intoxicated."  Whether Littler posed a threat to Justice's safety is difficult to assess based on the record before the court.  Littler argues that the size disparity between her and the Defendant Officers demonstrates that she did not pose a threat.  Justice stands 5'6" and weighs 146-150 pounds.  Roan and Lee are larger; Roan is 6'3" and 230 pounds and Lee is 5'10" and 195 pounds.  Justice Dep. 24, Roan Dep. 54, Lee Dep. 36.  Although there is no evidence about Littler's size in the record, she is shown on the videos to be of average or smaller than average weight and height.[2]  For their part, Defendants argue that Littler's "lack of self-control posed a threat."  Defs.' Mot. at 14.  Justice testified that once he grabbed Littler's arm, "her behavior was so wild" that he became concerned about his and her safety, and combined an arm bar with a takedown.  Littler admits that she "tried to shake off" Justice's arm, but the level of her resistance is not clear.

With respect to whether the officers used reasonable force, the question is whether an

---

[2] Plaintiffs assert, without evidence, that she is 5'1" and 105 pounds.  Pls.' Opp'n at 6.

United States District Court
Northern District of California

officer's actions were objectively reasonable in light of the facts and circumstances confronting him. *See Graham*, 490 U.S. at 396.  As part of this inquiry, the court must consider whether there was a *need* for the use of the force that was employed; as the Ninth Circuit has noted, the need for the force used is the essence of the *Graham* objective reasonableness analysis.  *Liston*, 120 F.3d at 976 ("'The force which was applied must be balanced against the *need* for that force: it is the need for force which is at the heart of the *Graham* factors.'" (emphasis in original) (quoting *Alexander v. City & Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994))).  As noted, none of the videos clearly depict Littler's movements toward Justice prior to the takedown.  A statement that an officer fears for his or her safety or the safety of others must be supported by "objective factors to justify such a concern." *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).  In the absence of a clear picture, literal and figurative, of the degree of threat posed by Littler to Justice, the court concludes that there is a genuine dispute of material fact which precludes a determination that the force used on Littler was reasonable in light of all of the circumstances.  A reasonable jury could conclude that the threat posed by Littler was minor or otherwise did not justify a need to take her to the ground, facedown, in order to restrain her.  The same jury could also conclude that despite Littler's admitted resistance to being restrained once she was on the ground, the three officers' use of force, including a control hold and wrist lock, was unreasonable for the same reason.  Accordingly, summary judgment on Littler's excessive force claims against the Defendant Officers is denied.

The Defendant Officers also move for summary judgment on Littler's excessive force claim on the ground that they are entitled to qualified immunity.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The analysis involves two inquiries.  First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id.* If, however, "a violation could be made out on a

United States District Court
Northern District of California

1    favorable view of the parties' submissions," the court must examine "whether the [constitutional]

2    right was clearly established."[1]  *Id*.  "The relevant, *dispositive inquiry* in determining whether a

3    right is clearly established is whether it would be clear to a reasonable officer that his conduct was

4    unlawful in the situation he confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)

5    (emphasis added) (internal quotation marks omitted) (citing *Saucier*, 533 U.S. at 202).  If the law

6    did not put the officer on notice that his conduct would be clearly unlawful, summary judgment

7    based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.

8         As discussed above, taken in the light most favorable to Littler, a reasonable jury could

9    conclude that Littler posed little or no threat to the Defendant Officers and accordingly could find

10   that their use of force was not justified under the circumstances.  It has long been established that

11   "[f]orce is excessive when it is greater than reasonable under the circumstances," *Santos*, 287 F.3d

12   at 854, and that "where there is no need for force, *any* force used is constitutionally unreasonable."

13   *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001).  Therefore, the Defendant Officers are not

14   entitled to qualified immunity at this stage.

15   **C.  California Civil Code section 52.1 (Bane Act)**

16        The Defendant Officers move for summary judgment on Littler's California Civil Code

17   section 52.1 claim.  California Civil Code section 52.1, the Bane Act, gives rise to a claim where

18   "a person or persons, whether or not acting under color of law, interferes by threats, intimidation,

19   or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or

20   enjoyment by any individual or individuals of rights secured by the Constitution or laws of the

21   United States, or of the rights secured by the Constitution or laws of this state."  Cal. Civ. Code §

22   52.1(a).  To prevail on a Bane Act claim, a plaintiff must demonstrate, *inter alia,* "intimidation,

23   threats or coercion."  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

24        Littler's Bane Act claim is based upon the Defendant Officers' alleged wrongful arrest and

25   use of excessive force.  Since the court grants summary judgment on Littler's arrest claim, it also

26

27   _____
     [1] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the
28   discretion to decide "which of the two prongs of the qualified immunity analysis should be
     addressed first in light of the circumstances in the particular case at hand."

United States District Court
Northern District of California

1    grants summary judgment on the Bane Act claim to the extent it is based on her detention. *See*

2    *Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1170-71 (9th Cir. 1996) ("because there is no federal

3    constitutional violation and no conduct specified which constitutes a state constitutional violation,

4    there is no conduct upon which to base a claim for liability under 52.1.")

5         As to the remaining Bane Act claim based on excessive force, the Defendant Officers

6    argue that a section 52.1 claim requires proof of threats, coercion, or intimidation beyond that

7    inherent in the excessive force.  This court has previously held, consistent with the weight of

8    authority in this district, that a section 52.1 claim "does not require threats, coercion, or

9    intimidation independent from the threats, coercion, or intimidation inherent in the alleged

10   constitutional or statutory violation." *See Hampton v. City of Oakland*, No. C-13-03094 DMR,

11   2014 WL 5600879, at *18 (N.D. Cal. Nov. 3, 2014) (quoting *D.V. v. City of Sunnyvale*, 65 F.

12   Supp. 3d 782, 798 (N.D. Cal. 2014)).  Therefore, the court denies summary judgment on Littler's

13   section 52.1 claim based on alleged excessive force by the Defendant Officers.

14        **D.  Negligence**

15        In order to establish a negligence claim, Littler must establish "(1) a legal duty to use due

16   care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps*

17   *v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cnty. of San*

18   *Mateo*, 12 Cal.4th 913, 917 (1996)).  Under California law, "police officers have a duty not to use

19   excessive force." *Id*. (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1101 (2004)).

20   As the court denies summary judgment on the claim for excessive force, summary judgment on

21   Littler's negligence claim is also denied.

22        **E.  Battery**

23        The law governing a state law claim for battery is the same as that used to analyze a claim

24   for excessive force under the Fourth Amendment. *See Sorgen v. City and Cnty. of San Francisco*,

25   No. C 05-03172 TEH, 2006 WL 2583683, at *9 (N.D. Cal. Sept. 7, 2006) (citing *Edson v. City of*

26   *Anaheim*, 63 Cal. App. 4th 1269, 1274-75 (1998)).  Given the disputes of fact regarding the

27   reasonableness of the Defendant Officers' use of force, the court denies summary judgment as to

28

United States District Court
Northern District of California

20

Littler's battery claim.[3]

## V.     CID'S CLAIMS

As noted above, Cid concedes all of his claims against Lee.  His Fourth Amendment claims are based upon his assertion that Roan and Justice lacked probable cause to arrest him.[4]

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.3d at 1072.  Defendants argue that Roan and Justice had probable cause to arrest Cid for violating California Penal Code section 148, because he delayed and interfered with the officers' performance of their duties, to wit, arresting Littler and investigating the battery.  They also argue that Roan had probable cause to arrest Cid for the battery on Bullard.

As noted above, California Penal Code section 148 provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is guilty of a misdemeanor.  Cal. Penal Code § 148(a)(1). "The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002).  "Penal Code section 148 is not limited to nonverbal conduct involving flight or forcible interference with an officer's activities." *People v. Quiroga*, 16 Cal. App. 4th 961, 968 (1993).

According to Justice, he arrested Cid "for not listening to our commands to back up further while we were in the struggle with his girlfriend."  Justice Dep. 62; Roan Dep. 48 (testifying that he arrested Cid for violating section 148).  Justice testified that Cid was not a safe distance away from where the officers were attempting to restrain Littler and that he "did not want to get kicked in the face."  *Id.*  Justice testified that this meant "that he should get further back than he was at the

---

[3] Plaintiffs' opposition references their "assault and battery" claims against the Defendant Officers. Pls.' Opp'n at 17-18.  However, neither Littler nor Cid alleged assault claims. *See* First Am. Compl. at ¶¶ 43-46.

[4] At the hearing, Cid conceded the lawfulness of his detention, and clarified that he challenges only the lawfulness of his arrest and the use of force to handcuff him.

United States District Court
Northern District of California

1  present time," and that Cid did not move far enough away from the officers.  Justice Dep. 62-63.

2  Justice then directed Roan to arrest Cid for violation of section 148.  Justice testified that he

3  subsequently assisted Roan with taking Cid into custody because Cid was still filming with his

4  camera and was not putting his arm behind his back.  Justice Dep. 63, Roan Dep. 48-49.  Justice

5  can be heard on his video telling Roan, "I got her," and directing Roan to "take care of [Cid],"

6  after which Roan got up and walked over to Cid.  Justice MVR 8:55.

7       In response, Cid argues that Justice and Roan did not have probable cause to arrest him for

8  violating section 148 because the video shows that when the officers told Cid to get back, he

9  complied and backed away from the officers.  This is inaccurate.  Justice's video depicts Cid's feet

10  approaching the officers at least three times.  Justice MVR 7:22, 7:28, 8:35.  Justice and Lee's

11  videos also confirm that Justice, Lee, and Roan repeatedly told Cid to back up.  Justice MVR

12  7:20-7:31; 8:22-8:55; Lee MVR 4:54-5:05.  *See, e.g., In re Muhammed C.*, 95 Cal. App. 4th at

13  1330 (concluding that it was reasonable to infer that minor willfully delayed officers' performance

14  of their duties by refusing repeated requests to step away from patrol car in which arrestee sat

15  talking to minor).

16       Cid also argues that to the extent that his actions obstructed the officers in the performance

17  of their duties, his actions were excused because he was responding to the officers' own unlawful

18  conduct, to wit, the use of excessive force toward Littler.  However, he offers no authority for the

19  proposition that in order to establish probable cause for violating section 148, the officers must

20  establish that their own actions were lawful.

21       Roan testified that in addition to Cid's violation of section 148, he also arrested Cid for

22  "the pending citizen's arrest" for the battery on Bullard.  Roan Dep. 48-49; Pointer Decl. Ex. 6

23  (Justice Report) (noting violation of California Penal Code section 243.35(a)).  For Fourth

24  Amendment claims of unlawful seizure, the Ninth Circuit has held that "[i]n establishing probable

25  cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a

26  crime, but must independently investigate the basis of the witness' knowledge or interview other

27  witnesses."  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 926 (9th Cir. 2001).

28  Here, Justice interviewed Bullard and Johnson immediately upon arriving at the 16th Street BART

22

1    station.  Bullard told Justice that Cid swung at him and knocked his hat off of his head, which

2    Johnson corroborated.  Justice MVR 1:17-1:21 (Cid "punched him, hit him," pointing to Bullard).

3    Johnson told Justice that Cid "needs to be arrested," and Justice later described the altercation to

4    Roan and told him that Bullard and Johnson wanted to put Cid under citizen's arrest.

5         Cid argues that there was no probable cause for the arrest for battery because he only

6    touched Bullard's hat, and did not make direct contact with Bullard's person.  This argument is

7    without merit.  As the California Supreme Court explained in *People v. Colantuono*, 7 Cal. 4th

8    206, 214 n.4 (1994), "[i]t has long been established, both in tort and criminal law, that the least

9    touching may constitute battery.  In other words, *force* against the person is enough, it need not be

10   violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark."

11   (emphasis in original; citation omitted).  Further, the relevant California jury instruction explains

12   that, "[m]aking contact with another person, including through his or her clothing, is enough to

13   commit a battery . . . . [t]he slightest touching can be enough if it is done in a rude or angry way."

14   Judicial Council of California, Criminal Jury Instruction 948.

15        Cid also argues that warrantless arrests for misdemeanors committed outside of an

16   officer's presence must be precipitated by a citizen's arrest, *id*. at 920, and that Bullard expressed

17   no interest in making a citizen's arrest of Cid when interviewed by Roan.  According to Cid,

18   Roan's video "reveals that [Roan] insisted and cajoled Bullard who thought the situation was

19   laughable as he literally bent over and laughed at the Defendant Officers' attempt to turn Bullard

20   into a complaining victim." Pls.' Opp'n at 13.  This is irrelevant.  It is undisputed that the

21   interview that forms the basis for Cid's argument took place *after* Roan and Justice arrested Cid.

22   *See* Roan Decl. ¶ 6.  Probable cause must be determined at the time the arrest was made.  At the

23   time Roan and Justice arrested Cid, Justice had spoken with Bullard about the incident, and

24   Johnson corroborated Bullard's description of the events.  Roan, who initiated the arrest of Cid,

25   was entitled to rely on Justice's report of his interview of Bullard and Johnson.  *See Motley v.*

26   *Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc).

27        The court finds that Cid has also failed to create a material dispute as to the facts

28   supporting probable cause for his arrest for violating California Penal Code section 148(a)(1) and

United States District Court
Northern District of California

23

battery.  Accordingly, the court grants summary judgment on Cid's claim that his arrest was not supported by probable cause.

Cid's claim for excessive force is based solely on Roan and Justice's use of handcuffs "in furtherance of his unlawful arrest."  Pls.' Opp'n at 14.  Cid does not otherwise argue that the officers' use of force was unreasonable.  Accordingly, since the court concludes that there is no dispute of fact as to whether Cid's arrest was lawful, summary judgment on Cid's excessive force claim is appropriate.  Cid's remaining claims—Bane Act, negligence, and battery—are each premised on Roan and Justice's alleged use of force.  As the court grants summary judgment on Cid's excessive force claim, summary judgment on these remaining claims is appropriate as well.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The surviving claims are Littler's claims against Justice, Lee, and Roan for excessive force, violation of the Bane Act, negligence, and battery.

**IT IS SO ORDERED.**

Dated: April 29, 2016



Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu

United States District Court
Northern District of California

24